# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AEOLUS DOWN, INC. )<br><br>Plaintiffs, )<br><br>v. )<br><br>CREDIT SUISSE INTERNATIONAL )<br><br>Defendant. ) | Civil Action No.: 10-8293 (LLS) |

## PLAINTIFF AEOLUS DOWN, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CREDIT SUISSE INTERNATIONAL'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

CHANG & COTÉ, LLP
19138 Walnut Drive, Suite 100
Rowland Heights, CA 91748
(626) 854-2112

Steven J. Coté, Esq.
scote@changcote.com
Dennis K. Lee, Esq.
dlee@changcote.com

HARWOOD LLOYD, LLC
130 Main Street
Hackensack, NJ 07601
(201) 487-1080

Evelyn R. Storch, Esq.
EStorch@harwoodlloyd.com

1

## TABLE OF CONTENTS

I.   PREFACE.................................................................................................2

II.  INTRODUCTION.......................................................................................3

III. SUMMARY OF ARGUMENT ......................................................................6

IV.  STATEMENT OF FACTS ...........................................................................7

V.   ARGUMENT ...........................................................................................7

A.  Standard of Review ...............................................................................7

B.  Credit Suisse's Defense Argument Of
    An Alleged Failure Of A Condition Precedent
    Does Not Defeat Aeolus Down's Right To
    Recover On Its Cause Of Action For Breach
    Of Contract. .........................................................................................7

    1.  *Under the pleaded facts and applicable law,*
        *Aeolus Down is entitled to the application of*
        *the principle that protects a contracting party*
        *against a forfeiture of contract benefits as the*
        *result of the failure of a condition precedent* ......................................10

        a.  *The Court may excuse the non-occurrence*
            *of a condition precedent if its enforcement*
            *would cause a "disproportionate forfeiture"*
            *on the party seeking to enforce the contract* ..................................10

        b.  *Because the "doctrine of forfeiture" may*
            *apply to the alleged facts, the Court may*
            *not dispose of Aeolus Down's contract claim*
            *on a pleading motion under Rule 12(b)(6)* ....................................11

    2.  *The allegations show that Credit Suisse prevented*
        *Aeolus Down from supplying the condition precedent*
        *by improperly insisting that Aeolus Down forfeit its*
        *substantive rights as part and parcel of the only*
        *form of Assignment Agreement that it would accept* ............................14

        a.  *A party to a contract may not take advantage of a*
            *self-caused failure of condition to avoid its obligation*
            *to perform*.................................................................................14

b. *The contract documents do not support Credit Suisse's refusal to accept an assignment from Aeolus Down based upon the actual sum of Aeolus Down's LNT receivable* .........................15

c. *If the provisions upon which Credit Suisse seeks to avoid its promises are ambiguous, they present an issue of fact. Dismissal would therefore be improper* ...............................................21

d. *Credit Suisse's proffered interpretation of the controlling documents ignores the reasonable expectations of the parties* ..........................22

C. The Allegation Of A Settlement Agreement With LNT's Chapter 7 Trustee Does Not Support A Grant Of The Defendant's Motion ................................................................................................24

D. Aeolus Down Has Stated A Valid Claim For Tortious Breach Of Contract ............27

VI. CONCLUSION ...............................................................................................................29

# TABLE OF AUTHORITIES

## Statutes

Rule 12(b)(6), Federal Rules of Civil Procedure ........................................................ 11

## Cases

*Ashcroft v. Iqbal*
129 S.Ct. 1937, 1949 [173 L.Ed.2d 868] (2009) ....................................................... 9


*Freedom Chemical Co. v. BC Sugar Refinery, Ltd.*
1998 WL 289736 (S.D.N.Y., June 4, 1998, 97 CIV. 4634 (JSR)),
*aff'd* sub nom. *Freedom Chemical Co. v. BC Sugar Refinery Ltd.,*
166 F.3d 1200 (2d Cir. 1998)........................................................................... 14


*In re Saranac Cent. School Dist. (Sweet Associates Inc.)*
253 A.D.2d 566, 567 [686 N.Y.S.2d 869, 871] (N.Y. App. Div. 1998)................... 22


*Kooleraire Serv. & Installation Corp. v. Board of Educ.*
28 N.Y.2d 101, 106, 320 N.Y.S.2d 46, 268 N.E.2d 782 ....................................... 14


*Maniolos v. U.S.*
741 F.Supp.2d 555, 567 (S.D.N.Y. 2010).......................................................... 22


*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*
500 F. 3d 171, 187 (2d Cir. 2007)........................................................................


*Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*
86 N.Y.2d 685, 691 [660 N.E.2d 415, 418] (1995) ................................................ 19


*People v. Roschli*
275 N.Y. 26, 29 [9 N.E.2d 763, 764] (1937) ....................................................... 27


*Pramco III, LLC v. Partners Trust Bank*
16 Misc.3d 351, 363 [842 N.Y.S.2d 174, 185] (N.Y. Sup. Ct. 2007) ................. 11, 12


*Rescuecom Corp. vs. Google, Inc.*
562 F3d. 123, 127 (2nd Cir. 2009)................................................................. 12-13


*Rexnord Holdings v. Bidermann*
21 F.3d 522, 525 (2d Cir. 1994)....................................................................... 8

*Roberts v. Acres*
    495 F.2d 57, 58-59 (7th Cir. 1974) ........................................................................... 8

*Rocanova v. Equitable Life Assur. Soc. of U.S.*
    83 N.Y.2d 603, 613 [634 N.E.2d 940, 943-44] (1994); ........................................... 28

*Seiden Associates, Inc. v. ANC Holdings, Inc.*
    959 F.2d 425, 428  (2d Cir. 1992) .......................................................................... 22

*Stewart v. Jackson & Nash*
    976 F.2d 86, 87 (2d Cir. 1992) .................................................................................. 7

*Uribe v. Merchants Bank of New York*
    91 N.Y.2d 336, 341 [693 N.E.2d 740, 743] (1998) ................................................. 23

## Secondary Materials

Rest.2d Contracts § 229 (1981) ...................................................................................... 10

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| AEOLUS DOWN, INC. | ) ) ) | Civil Action No.: 10-8293 (LLS) |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| CREDIT SUISSE INTERNATIONAL | ) ) | |
| Defendant. | ) ) ) | |

Plaintiff, Aeolus Down, Inc. ("Aeolus Down"), by and through its attorneys of record, Chang & Coté, LLP and Harwood Lloyd, LLC, respectfully submits this Memorandum of Law in Opposition to the Motion to Dismiss the First Amended Complaint by Defendant Credit Suisse International ("Credit Suisse"):

## I. PREFACE.

If there is a recurring theme to the Motion to Dismiss now before the Court, it is found in the Defendant's insistence that the Plaintiff has "fail[ed] to cure the defects of the original Complaint." (Def's Memorandum of Law In Support of Motion to Dismiss Amended Complaint, pg. 1.) By posturing its motion in this way, the Defendants suggest that the Court has already reviewed the Plaintiffs' substantive allegations and found them wanting. Of course, there is a considerable psychological advantage to be gained if the Court can be convinced that it

has already ruled once on the merits in favor of Credit Suisse. It fosters the false impression that the Plaintiff already has one or two strikes against it and is now advancing its final attempt to save a lawsuit that the Court has already deemed questionable.

This is not the case. Although Credit Suisse did file a prior motion to dismiss that raised the arguments that they now present anew, the Court never ruled on those arguments. Instead, on July 5, 2011 the Court requested an amendment of the Complaint to more clearly indicate the basis for federal jurisdiction. "It is unnecessary to reach the merits of defendants' motion because the complaint does not establish subject matter jurisdiction." (Memorandum Endorsement filed on July 5, 2011.) Aeolus Down's pleading has therefore been amended to substitute a citation to 28 U.S.C. section 1332 (diversity jurisdiction) as the basis for federal subject matter jurisdiction in place of the incorrect citation of 28 U.S.C. section 1331 (federal question jurisdiction) that appeared in the original Complaint. (See, First Amended Complaint ("FAC"), ¶ 2.)

Plaintiff also used the amendment opportunity to refine its allegations to address some of the arguments deployed by Credit Suisse in its original motion as a means to avoid further motion practice. While that strategy has failed to bear fruit, Aeolus Down hopes that the Court will not be misled as to the procedural context of this motion. This is the very first time that the Court has addressed the merits of the arguments asserted by Credit Suisse.

## II. INTRODUCTION.

The portrayal of circumstances offered by Credit Suisse in its moving papers makes its ensuing argument almost seem reasonable. All that Aeolus Down had to do to receive the $2.3 million benefit provided for in its line of credit insurance was to comply with the clear and simple requirement that it execute an Assignment Agreement within the time specified in the

Master Agreement.  Credit Suisse apparently contends that, inexplicably, Aeolus Down failed to take that crucial step. Therefore, by virtue of its omission, Aeolus Down forfeited all of the benefits that Credit Suisse had accepted over $650,000 to provide.

So *why* did Aeolus Down – represented by legal counsel at the time and attempting to follow Credit Suisse's specific instructions – fail to perform so elementary a task and thereby forfeit its valuable indemnification rights in the face of the very event – a Linens N Things ("LNT") bankruptcy – against which it had insured itself?  Credit Suisse's account is hazy on that point.  Since this part of the tale is integral to Aeolus Down's legal posture in the case, it will be explained here, in brief, with further explication provided as needed below.

The clerical error by LNT's bankruptcy counsel resulted in Aeolus Down's receivable being listed incorrectly on the schedule of a related entity, LNT Merchandising LLC ("LNTM"), rather than on the correct schedule of Aeolus Down's actual customer, LNT.  Per Credit Suisse's application of the relevant contractual language, the error placed Aeolus Down in a position that it could not win.  And conversely, the mis-scheduling of Aeolus Down's receivable placed Credit Suisse in a position that it believed could not lose.

Under the Master Agreement, Credit Suisse was required to insure Aeolus Down for the "Net Account Value of the Account Claims", which is the actual accounts receivable due to Aeolus Down by LNT, up to $2.3 million.  However, under an unsigned and separate Assignment of Claims Agreement form Credit Suisse presented to Aeolus Down, Credit Suisse was required only to indemnify Aeolus Down for the "Scheduled Claim Amount."  This was defined as the receivable amount listed on LNT's initial bankruptcy schedules, up to $2.3 million.

As noted above, the clerical error made the receivable amount on LNT's schedule $0.00. Accordingly, had Aeolus Down complied with Credit Suisse's demand that it execute the Assignment of Claim Agreement within the 25-day deadline, Aeolus Down would have forfeited all of its substantive rights under the Master Agreement.   In other words, Credit Suisse maneuvered to exploit the fortuitous occurrence of LNT's clerical error as a means to force Aeolus Down to relinquish the very benefits that it had purchased under the Master Agreement.

Credit Suisse has a response to this, tendered in evident seriousness.  First, it argues that "Aeolus Down could have very easily executed the assignment of claim agreement and then been paid pursuant to the terms agreed to in the agreement." (Def's Memorandum of Law at p. 3; emphasis added.)  Here, Credit Suisse argues that had Aeolus Down simply delivered and executed the form of Assignment of Claim Agreement within the 25-day deadline period,  it would have preserved its rights to claim whatever Credit Suisse managed to collect, if anything, as Aeolus Down's assignee upon the resolution of the LNT bankruptcy.

Credit Suisse glosses over the obvious fact that this means that Aeolus Down would have received no benefit at all.  Aeolus Down *always* possessed the right to recover whatever the Bankruptcy Court awarded on its own unsecured claim upon the final resolution of the litigation; it did not need to pay Credit Suisse over $650,000 in premiums to have it stand inertly by to pass it the funds when they were finally paid out.  Hence, this proffered "benefit" is transparently worthless.

The big picture here is that Aeolus Down purchased a costly insurance contract from Credit Suisse.  The insured risk materialized when LNT sought bankruptcy protection leaving more than $2.3 million in Aeolus Down receivables unpaid.  *Now Credit Suisse has seized upon the serendipitous error of a third party to avoid paying its obligations under a nonsensically*

5

*ambiguous contract term contained in the Assignment of Claim Agreement while ignoring its*

*clear obligation under the Master Agreement.*

### III. SUMMARY OF ARGUMENT

Aeolus Down submits that the factual allegations of the First Amended Complaint and

the contents of the relevant governing documents support two viable theories under which the

Court may properly grant relief:

- First, Credit Suisse effectively seeks to impose a forfeiture upon Aeolus Down by

  using the clerical error of LNT to deprive it of all of its substantive rights under its

  indemnification agreement.  Well-established principles of contract law permit the

  Court to excuse strict technical compliance with the conditions imposed by a

  contract when requiring such strict adherence would work an injustice upon one

  of the parties.  The facts alleged in the First Amended Complaint clearly depict

  such a situation, in that (a) the error that caused the mis-scheduling of the LNT

  debt was entirely outside of the control of Aeolus Down; (b) Aeolus Down will

  lose all of the protection of its costly indemnification agreement if the condition

  provision is strictly enforced; (c) Credit Suisse will have recovered an undeserved

  windfall if it is relieved of its contract obligations toward Aeolus Down after

  collecting hundreds of thousands of dollars in premiums under the agreement; and

  (d) Credit Suisse was in no way prejudiced by Aeolus Down's inability to

  properly assign its claims within the 25-day deadline.

- Second, the documents fail to support Credit Suisse's interpretation, or at the very

  least, are ambiguous.  Credit Suisse's interpretation would thwart the obvious

intentions of the parties when the agreement was made and paid for by Aeolus Down.

Such issues are not susceptible of disposition by the Court on a pleading motion. The First Amended Complaint states a valid claim, and the motion of Credit Suisse must be denied.

## IV.  STATEMENT OF FACTS

Credit Suisse's recitation of Aeolus Down's factual allegations in the First Amended Complaint is reasonably fair. Accordingly, they will not be recited at length here, except to the extent that particular allegations may bear upon a specific argument asserted by Credit Suisse.

## V.  ARGUMENT

### A.    Standard of Review

Aeolus Down accepts the legal analysis of Credit Suisse as to the standard of review on a motion to dismiss, with the following additional authorities. The standard of review on a motion to dismiss is heavily weighted in favor of the plaintiff. The court is required to read a complaint generously, drawing all reasonable inferences from the complaint's allegations. The court must deny the motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Stewart v. Jackson & Nash*, 976 F.2d 86, 87 (2d Cir. 1992).

### B.    Credit Suisse's Defense Argument Of An Alleged Failure Of A Condition Precedent Does Not Defeat Aeolus Down's Right To Recover On Its Cause Of Action For Breach Of Contract.

Credit Suisse's argument is founded upon the premise that the First Amended Complaint "does not allege that [Aeolus Down] adequately performed under the Master Claim Agreement and Confirmation Agreements, that Credit Suisse breached the agreements, or that it suffered any

damages." (Def's Memorandum of Law, pg. 11.)  This conclusion is refuted by the following

allegations and legal principles.

An action for breach of contract requires allegation of (1) a contract; (2) performance of

the contract by one party; (3) breach by the other party and (4) damages. *Rexnord Holdings v.*

*Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994).  The First Amended Complaint contains the

following allegations at paragraphs 30-32:

> 30.     AEOLUS DOWN *has performed all conditions of the Insurance
> Policy on its part to be performed* and, in accordance with the terms of the
> Insurance Policy, gave CREDIT SUISSE due and timely notices of its loss
> and and Account Claims.

> 31.     On multiple occasions, AEOLUS DOWN had attempted to assign
> the Account Claims to CREDIT SUISSE and demanded payment of the
> sum of $2.3 Million Dollars, as alleged hereinabove.   But CREDIT
> SUISSE has wrongfully failed and refused, and continues to wrongfully
> fail and refuse, to pay AEOLUS DOWN that sum or any part of it, and
> there is now due and owing from CREDIT SUISSE, to AEOLUS DOWN
> the approximate sum of $2.3 Million, the exact amount of which to be
> proved at the time of trial.

> 32.     As a proximate result of the failure and refusal of CREDIT
> SUISSE as herein alleged, AEOLUS DOWN has been damaged in the
> sum in excess of $2.3 Million, or such other sum according to proof at the
> time of trial, with interest on said sum at the legal rate from CREDIT
> SUISSE's breach on or about September 2008, the date on which CREDIT
> SUISSE notified AEOLUS DOWN in writing of CREDIT SUISSE's
> denial of coverage under the Insurance Policy for AEOLUS DOWN's
> above-described claim. (Emphasis added.)

Aeolus Down respectfully points out that in federal practice, pleadings are to be liberally

construed.  "The relevant facts may be determined by discovery, [footnote omitted] with the

pleadings being liberally construed so as to do substantial justice and facilitate a proper decision

on the merits." (*Roberts v. Acres* 495 F.2d 57, 58-59 (7th Cir. 1974).  Rule 8 of the Federal Rule

of Civil Procedure imposes only the following requirements upon the pleader:

"(a) Claim for Relief.  A pleading that states a claim for relief must contain:

(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Interpreting the rule, the Supreme Court held that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." (*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 [173 L.Ed.2d 868] (2009).)

Plaintiff submits that the First Amended Complaint easily meets this standard. It alleges the existence of a contract that is composed of two complex, related documents – the Master Agreement and the Confirmation Agreement. (FAC, ¶ 9.) Each is attached to the pleading as an exhibit. (See, Exh. 1: the Master Agreement; Exh. 2: the Confirmation Agreement.) Accordingly, there can be little doubt that a contract between Aeolus Down and Credit Suisse has been sufficiently pled.

Damages have also been set forth. Paragraphs 31 and 32 allege that Credit Suisse failed to pay the $2.3 million price that it was obliged to pay for an assignment of claims under the terms of the agreement. This takes the allegations well beyond the "unadorned, the-defendant-unlawfully-harmed-me accusation" that the Supreme Court rejected in *Ashcroft v. Iqbal, supra.* Hence, Credit Suisse's assertion that Aeolus Down "does not allege…that it suffered any damages" (Def's Memorandum of Law, pg. 11) simply fails to concede the black and white contents of the pleading. An objective reader of the First Amended Complaint would easily

comprehend the amount of Aeolus Down's claimed damages and the manner in which they arose.

Credit Suisse's most substantive point addresses the "performance" element.  Citing the contents of the documents, Credit Suisse alleges that Aeolus Down cannot plead that it has complied with the conditions of the agreement and therefore, Credit Suisse could not have breached its obligations.  (Def's Memorandum of Law, ppg. 11-17.)  Aeolus Down contends that the facts alleged in the First Amended Complaint, in conjunction with the contents of the relevant documents attached as exhibits thereto, preclude Credit Suisse from avoiding its performance obligations by asserting a failure of condition precedent.  Accordingly, Aeolus Down's right to recover is not impaired by its failure to execute the Assignment of Claim Agreement demanded by Credit Suisse.

1. ***Under the pleaded facts and applicable law, Aeolus Down is entitled to the application of the principle that protects a contracting party against a forfeiture of contract benefits as the result of the failure of a condition precedent.***

    a. *The Court may excuse the non-occurrence of a condition precedent if its enforcement would cause a "disproportionate forfeiture" on the party seeking to enforce the contract.*

If Credit Suisse is allowed to invoke a chance error that was entirely outside of Aeolus Down's control as a means of avoiding its promises, Aeolus Down will suffer the calamitous loss of all of the protection that it sought when it paid Credit Suisse more than $627,000 in premiums and conversely, Credit Suisse would have realized an enormous windfall at Aeolus Down's expense.  Fortunately, there is a mechanism in the law that precludes the judicial validation of such an injustice.  It is set forth succinctly by the Restatement of Contracts:

> "To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange."
> (Rest.2d Contracts § 229 (1981).)

New York law recognizes this "doctrine of forfeiture" and defines the parameters under

which it may be deployed:

> "[T]he doctrine of forfeiture is on these facts clearly invoked. [Footnote omitted.]
> *First*, if the non-occurrence of the condition is not excused, defendant[1] will 'lose
> its right to the agreed exchange after it has relied substantially, as by preparation
> or performance on the expectation of that exchange.' [Citations]. *Second*,
> defendant unquestionably conferred a benefit on plaintiff when it delivered the
> loans it sold together with an assignment to plaintiff of the collateral. Compare *id.*
> 86 N.Y.2d at 692, 636 N.Y.S.2d 734, 660 N.E.2d 415 ("undisputed" that party
> seeking to avoid non-occurrence of condition "has not ... conferred a benefit upon
> defendant"); *id.* 86 N.Y.2d at 694, 636 N.Y.S.2d 734, 660 N.E.2d 415 (avoidance
> of forfeiture rationale presupposes that the party seeking to avoid it have
> conferred a benefit upon the other party). *Third*, 'a court may excuse the non-
> occurrence of th[e] condition unless its occurrence was a material part of the
> agreed exchange.' [Citations.]" (*Pramco III, LLC v. Partners Trust Bank*, 16
> Misc.3d 351, 363 [842 N.Y.S.2d 174, 185] (N.Y. Sup. Ct. 2007), *aff'd*, 52 A.D.3d
> 1224 [860 N.Y.S.2d 775] (N.Y. App. Div. 2008); emphasis added.)

Applied to this case, the factors identified in *Pramco III, LLC* preclude the granting of

Credit Suisse's motion to dismiss.

      b.    *Because the "doctrine of forfeiture" may apply to the alleged facts, the Court*
*may not dispose of Aeolus Down's contract claim on a pleading motion under*
*Rule 12(b)(6).*

The factual allegations of First Amended Complaint fall squarely within the factors cited

in *Pramco III, LLC v. Partners Trust Bank, supra.*   First, a finding that the condition precedent

failed to occur would result in the complete forfeiture of Aeolus Down's rights under the

agreement "after it has relied substantially..." on Credit Suisse's promise of performance.  Credit

---

[1]  It should be noted that in *Pramco II, LLC*, the roles of plaintiff and defendant were reversed in
comparison to the instant lawsuit.  There, it was the plaintiff buyer who argued that the subject
contract obligations never arose because of the failure of a condition precedent as support for its
rescission claim.  The defendant lender responded that the condition should be excused under the
forfeiture principle.  Here, it is the defendant who seeks to invoke the failure of a condition
precedent as a defense against Aeolus Down's claims on the contract.  Aeolus Down, the
plaintiff, asserts the application of the forfeiture principle.

Suisse would pay nothing.  Moreover, now that the subject risk has been realized with the filing of the LNT bankruptcy, Aeolus Down cannot simply go out into the marketplace to purchase a replacement contract that would take up the burden of Credit Suisse's faithless promises.

Second, Aeolus Down has directly conferred a benefit upon Credit Suisse through the parties' contractual arrangement.  ("[A]voidance of forfeiture rationale presupposes that the party seeking to avoid it [*e.g.*, Aeolus Down] have conferred a benefit upon the other party." *Pramco III, LLC at 363, supra.*)  Aeolus Down paid hundreds of thousands of dollars in premium dollars in exchange for the promise of protection on which Credit Suisse now seeks to renege.  (FAC, ¶ 10.)

The third factor cannot be decided on the pleadings.  Credit Suisse insisted that regardless of the extant circumstances (*i.e.*, the erroneous scheduling of LNT's debts), the 25-day deadline for submission of the Assignment of Claims *must* be met and the state of the LNT bankruptcy schedules *as of that date* would finally determine Aeolus Down's payment rights.  It could have acknowledged the corrected LNT schedule, filed just 34 days later,[2] and there would have been no question that Aeolus Down was entitled to immediate compensation from Credit Suisse for its LNT receivables in the sum of $2.3 million.  Citing the 25-day deadline, Credit Suisse refused to wait and refused to re-draft the Assignment of Claims form once the error was corrected.  (FAC, ¶¶ 20-21.)

On a motion to dismiss under Rule 12(b)(6), all reasonable inferences from the facts must be drawn in favor of the plaintiff.  (*Rescuecom Corp. vs. Google, Inc.*,  562 F3d. 123, 127 (2nd

---

[2]  The erroneous Initial Schedule was filed on July 15, 2008, triggering the 25-day deadline for the Assignment of Claims under the Master Agreement.  (FAC, ¶ 15; Master Agreement, section 5.)  The deadline was thus August 9.  LNT's Initial Schedule was corrected to reflect the Aeolus Down debt on September 12, 2008.  (FAC, ¶ 20.)

Cir. 2009).)  The facts alleged in the First Amended Complaint support the inference that there was no legitimate business reason that would make Credit Suisse's unyielding 25-day deadline "a *material* part of the agreed exchange."  (*Ibid.*)

Finally, the "forfeiture principle" is clearly intended as a safeguard against an unjust result.  In that regard, it must be pointed out that the equities in this matter favor Aeolus Down decisively.  It paid handsomely for the protection supposedly offered by Credit Suisse's put obligation and Credit Suisse happily accepted those fees.  Further, Aeolus Down had no fault whatsoever in the mis-scheduling of LNT's debt that Credit Suisse seeks to use to justify its release from its obligations – it was a blameless victim of a trivial error that was entirely outside of its control, but if Credit Suisse prevails, it will pay an enormous price for that mistake.  And it cannot be overlooked that if Aeolus Down's rights are declared forfeit, Credit Suisse will reap a rich windfall at the expense of Aeolus Down.  It will retain its fees while refusing to pay out on the very risk that was contemplated by the parties' agreement.  The Court should not countenance that result if the law provides for a doctrine that would subvert such a conclusion.  Fortunately for Aeolus Down, it does.

Accordingly, the allegations support Aeolus Down's claim of breach of contract as the factual basis for the application of the "doctrine of forfeiture" is present.  Credit Suisse's motion to dismiss the claim for "failure to state a claim upon which relief can be granted" should be denied.

2.   ***The allegations show that Credit Suisse prevented Aeolus Down from supplying the condition precedent by improperly insisting that Aeolus Down forfeit its substantive rights as part and parcel of the only form of Assignment Agreement that it would accept.***

    a.   *A party to a contract may not take advantage of a self-caused failure of condition to avoid its obligation to perform.*

New York law provides that a party to a contract cannot engineer the failure of a condition precedent as a means of avoiding its duty to perform.

> 'A party cannot insist upon a condition precedent, when its non-performance has been caused by himself.' (*A.H.A. Gen. Constr. v New York City Hous. Auth.,* [92 N.Y.2d 20] at 31, 677 N.Y.S.2d 9, 699 N.E.2d 368, quoting *Young v. Hunter,* 6 N.Y. 203, 207). 'One may not take advantage of a condition precedent, the performance of which he himself has rendered impossible.' (*Kooleraire Serv. & Installation Corp. v. Board of Educ.,* 28 N.Y.2d 101, 106, 320 N.Y.S.2d 46, 268 N.E.2d 782, quoting *Stern v. Gepo Realty Corp.,* 289 N.Y. 274, 277, 45 N.E.2d 440).

> *See also, Freedom Chemical Co. v. BC Sugar Refinery, Ltd.,* 1998 WL 289736 (S.D.N.Y., June 4, 1998, 97 CIV. 4634 (JSR)), *aff'd sub nom. Freedom Chemical Co. v. BC Sugar Refinery Ltd.,* 166 F.3d 1200 (2d Cir. 1998) ["The so-called 'prevention' doctrine 'excuses a condition precedent when a party wrongfully prevents that condition from occurring.'"].)

In its effort to evade its promises to Aeolus Down, Credit Suisse ran afoul of this rule. It refused to accept an Assignment of Claims from Aeolus Down within the 25-day deadline unless that assignment included a relinquishment of all of Aeolus Down's substantive rights under "put" contract. By imposing such a condition as a term of accepting the assignment, Credit Suisse breached its own agreement and caused the failure of condition on which it now seeks to exonerate itself.

    b.    *The contract documents do not support Credit Suisse's refusal to accept an assignment from Aeolus Down based upon the actual sum of Aeolus Down's LNT receivable.*

Unfortunately, the discussion that follows cannot avoid extensive reference to the language of the contract documents themselves. The controlling documents are, charitably described, Byzantine in their prolixity, their tortured syntax and their multiple layers of nested defined terms.[3] In an effort to promote clarity of the argument presented below, Plaintiff will minimize its recitation of contract language to that which is pertinent to the point at hand. It will denote important defined terms through the use of bolded text.

The documentation of the agreement between Credit Suisse and Aeolus Down consists of three key writings. Briefly described, they are:

(a)    The <u>Master Agreement</u>: This document, attached as Exhibit 1 to the First Amended Complaint, defines the general terms of the relationship of the parties. Its key provision is found in Section 4, wherein Aeolus Downs' right to exercise a "put" (*i.e.*, its right to compel Credit Suisse to pay it in cash for its current LNT accounts receivable) upon the occurrence of a "Specified Event" is described. An LNT bankruptcy filing constitutes a "Specified Event." (See Confirmation Agreement, Item 10.)

(b)    The <u>Assignment of Claim Agreement</u>: This document is attached to the Master Agreement (Exh. 1) as Exhibit B. It is the instrument by which a "put" is to be exercised by Aeolus Down upon the occurrence of a "Specified Event."

---

[3]    Perhaps the opaque nature of the controlling documents accounts for Credit Suisse's insistence that Aeolus Down was a "sophisticated seller, with knowledge and experience in financial and business matters." (Def's Memorandum of Law, pg. 11.) Credit Suisse is clearly defensive about the fact that its contract documents would be utterly indecipherable to anyone but the most determined, legally-trained analyst.

(c)     The <u>Confirmation Agreement</u>:  Attached to the First Amended Complaint as Exhibit 2, this document fills in the specific quantitative and definitional terms applicable to the Master Agreement, including identifying the "Expiration Date," the "Company," the "Specified Event" and dollar amounts applicable to Credit Suisse's indemnification obligation.

The Master Agreement (FAC, Exh. 1) describes the conditions which must be met before Credit Suisse is obliged to accept the assignment of Aeolus Down's accounts receivable upon the occurrence of a "Specified Event."  It provides:

> 8.     <u>Conditions Precedent to Purchase of **Account Claims**</u>.  The obligation of Purchaser to purchase the **Account Claims** under a Put is subject to the satisfaction of the following conditions precedent:
>
> (a)     Seller shall have executed the Assignment of Claim Agreement, substantially in the form of Exhibit B hereto, selling, transferring and assigning the **Account Claims** to Purchaser (the 'Assignment Agreement') *in an amount equal to the Net Account Value of the Account Claims*.  (Master Agreement, paragraph 8; emphasis added.)

What is "the Net Account Value of the **Account Claims**" that defines Aeolus Down's right to recover compensation from Credit Suisse?  In essence it is the *actual value of Aeolus Down's LNT receivable* after deducting certain chargebacks, credits and disputed transactions. The Master Agreement's definition reads in full as follows:

> "<u>Net Account Value</u>" means, with respect to any **Accounts Receivable**, *the gross invoice amount of the invoices relating to such **Accounts Receivable***, less: (i) any discount of the gross invoice amount of the invoices relating to the **Accounts Receivable**; plus any allowance, chargeback or other credit to which the Company is or would be entitled; (ii) any amounts received from any source as or towards payment of such invoices on or prior to the Closing Date; (iii) the gross invoice amount of any goods that were not shipped or delivered to or are not accepted by the Company or are subject to Dispute or services that were not performed or accepted by the Company, or which were returned by or recovered from the Company (by reclamation or otherwise) on or before the Closing Date; (iv) any interest, penalties and fees included in such gross invoice amount; (v) any

applicable sales tax, value added tax or comparable taxes with respect to the transaction giving rise to such accounts receivable; and (vi) any other amount which would reduce the amount of the invoice payable to the seller.

Hence, the condition precedent imposed by the Master Agreement requires Aeolus Down to assign "Account Claims"[4] that are based on the true value of its LNT receivables, and not on the amount that happened to be stated on a bankruptcy schedule.

The Master Agreement also sets forth the terms of Credit Suisse's obligation to buy Aeolus Down's LNT accounts once the conditions precedent of paragraph 8 have been satisfied. Here is the key language of section 4(b):

> "Subject to the conditions set forth in <u>Section 8</u>, on the Closing Date, *Purchaser shall pay the **Schedule Purchase Price** to Seller* in immediately available funds in United States dollars by wire transfer to Seller's account set forth on the signature page of the Assignment Notice.  Upon receipt by Seller of the Schedule Purchase Price, Purchaser shall be the absolute owner of the Account Claims."  (Emphasis added.)

The "Schedule Purchase Price" is therefore a decisive term for it defines what Credit Suisse must immediately pay once Aeolus Down has assigned all of its LNT account claims to

---

[4]  An "Account Claim" is defined as "such **Accounts Receivable** that are **Eligible Accounts**." (Master Agreement, ¶ 4(a).)  An "Eligible Account" means,

> "...any of the **Accounts Receivable**: (i) which does not represent a sale by a parent, subsidiary or affiliate of the Company, or a consignment, sale or return, or bill and hold the transaction; (ii) which is denominated and payable only in United States dollars; (iii) which is not subject to a Dispute; and (iv) (A) if it relates to a Prepetition Put, to the extent and only to the extent they are or will become allowed claims against the Company within the meaning of Section 502 of the Bankruptcy Code, or (B) if it relates to a Postpetition Put, to the extent and only to the extent they are or will become allowed administrative expense claims against the Company within the meaning of Section 503(b)(1)(A) of the Bankruptcy Code."

Notably, nothing in the foregoing definitions undermines the basic premise of Paragraph 8(a) of the Master Agreement, which bases Credit Suisse's purchase obligation upon the actual value of Aeolus Down's receivable with LNT.

Credit Suisse.  What is it?  The definitions of Section 1 of the Master Agreement only refer to

another document:

> "**Schedule Purchase Price** has the meaning provided in <u>Section 2</u> of the
> Assignment Agreement."

There is no "Assignment Agreement."  However, there *is* an "Assignment of Claim

Agreement"[5] and in section 2 one encounters this problematic definition of Schedule Purchase

Price:

> "<u>Payment of</u> **Schedule Purchase Price**. *The consideration paid by Purchaser to
> Seller for the Transferred Claim Rights, the receipt and sufficiency of which is
> hereby acknowledged by Seller, is the* **Purchase Price** *(the '***Schedule Purchase
> Price***') set forth on* <u>*Schedule II*</u> *of this Agreement*.  Purchaser and Seller
> acknowledge and agree that Purchaser shall pay the Schedule Purchase Price, if
> applicable, to Seller within one business day following Seller and Purchaser's
> receipt of a fully executed copy of this Agreement (including the Evidence of
> Transfer of Claim, as defined below), by wire transfer of immediately available
> funds to Seller's account set forth on Schedule I hereto, an amount equal to the
> product of (a) Purchase Rate (as set forth in Schedule II of the Agreement), times
> (b) ___ (Purchaser's pro rata share of the amount of the Claim listed on the
> Schedules, as defined below, as undisputed, non-contingent and liquidated as of
> the Effective Date (the 'Scheduled Claim Amount')) [sic].  The date on which
> Purchaser pays the Schedule Purchase Price, if applicable, to Seller is hereinafter
> referred to as the 'Effective Date.'"  (Emphasis added.)

The first sentence (in italics) appears to represent a self-contained definition of the

Schedule Purchase Price.  It refers to yet another defined term, the "Purchase Price."  The

Purchase Price is defined in Section 1 of the Master Agreement:

> "**Purchase Price** means the sum of the **Schedule Purchase Price** and the
> Additional Purchase Price; provided, however, that such sum shall in no event
> exceed the product of the Net Account Value of the Account Claims multiplied by
> the Purchase Rate.

---

[5]  It is almost comical to note that Credit Suisse has even specially defined "Assignment
Agreement."  To find this definition, one must first refer to the definitions of the Master
Agreement in section 1.  There, one finds that "'Assignment Agreement' has the meaning
provided in Section 8(a).)"  Moving to Section 8(a), one learns that the Assignment of Claim
Agreement is to be called the "Assignment Agreement."

In this fashion, the definition of "Schedule Purchase Price" is turned back on itself.  It is defined in part by the "Purchase Price," which in turn is defined in part by the very terms that defines *it*, the "Schedule Purchase Price."  Aeolus Down submits that even the most dedicated logician could not extricate a clear explanation of the Schedule Purchase Price from Credit Suisse's documents.

In summary, the Schedule Purchase Price must be paid to Aeolus Down immediately upon compliance with the conditions precedent of Section 8 of the Master Agreement.  One of those conditions requires Aeolus Down to assign $2.3 million in LNT accounts receivable within 25 days of the Specified Event.  Upon that assignment, Credit Suisse must immediately pay the "**Schedule Purchase Price**" to Aeolus Down.  However, the **Schedule Purchase Price** is the **Purchase Price**, which is to be written into a blank in Schedule II of the Assignment of Claim Agreement.  And the **Purchase Price** can be determined only with reference to the **Schedule Purchase Price**.

Credit Suisse may respond that the Schedule Purchase Price is actually determined by the formula that appears in the latter part of Section 2 of the Assignment of Claim Agreement.  However, this contention should be rejected by the Court, as there is *no grammatical connection* between the language in the latter half of Section 2 and the language that defines "Schedule Purchase Price."  The Court should not supply important language to uphold a forfeiture when the drafter himself has neglected to do so. (*Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.,* 86 N.Y.2d 685, 691 [660 N.E.2d 415, 418] (1995) ).[6]

---

[6]  "In determining whether a particular agreement makes an event a condition courts will interpret doubtful language as embodying a promise or constructive condition rather than an express condition.  This interpretive preference is especially strong when a finding of express condition would increase the risk of forfeiture by the obligee." *Id.*

19

Finally, it must be noted that the second part of Section 2 ultimately fails to support Credit Suisse's position, even if one grants the unwarranted accommodation of incorporating it into the "Schedule Purchase Price" definition.  The language describes a calculation:

> [A]n amount equal to the product of (a) Purchase Rate (as set forth in Schedule II of the Agreement), times *(b) ___ (Purchaser's pro rata share of the amount of the Claim listed on the Schedules, as defined below, as undisputed, non-contingent and liquidated as of the Effective Date* (the 'Scheduled Claim Amount')).  The date on which Purchaser pays the Schedule Purchase Price, if applicable, to Seller is hereinafter referred to as the 'Effective Date.'

The definition for "Schedules" appears in Section 4 of the Assignment of Claim Agreement:

> [T]he Debtor's schedules of creditors holding unsecured claims filed or to be filed with the Bankruptcy Court, *as the same may be amended from time to time* (the 'Schedules') as neither disputed, contingent or on liquidated, in the amount of not less than the amount of the Scheduled Claim Amount specified on the first page of this Agreement....  (Assignment of Claim Agreement, Section 4; emphasis added.)

As noted, LNT's initial bankruptcy schedule (apparently comprising a "Schedule" within the foregoing definition) erroneously failed to reflect any of the debt owed to Aeolus Down. (FAC, ¶ 15.)  However, *it was amended* to reflect the correct debt on September 12, 2008, less than two months after the original schedules were filed.  (FAC, ¶ 20.)  Certainly, this amended schedule must be included within "the Debtor's schedules of creditors holding unsecured claims...*as the same may be amended from time to time.*"  (Assignment of Claim Agreement, Section 4.)  Hence, the phrase, "as may be amended from time to time" clearly undermines Credit Suisse's key point that Aeolus Down's "put" rights were by limited to the receivables that appeared on LNT's schedule in the first 25 days of LNT's bankruptcy filing.  Plaintiff submits that no objective interpreter of the documents would accept the proposition that "as may be amended from time to time" included only those amendments that occurred within the initial 25

20

day time frame.  Yet that is the interpretation upon which Credit Suisse's position must necessarily rest.

Aeolus Down alleged (and will prove) that once the LNT schedule was corrected, it attempted to assign its claims to Credit Suisse but Credit Suisse refused to accept the assignment, citing the passage of 25 days.  (FAC, ¶¶ 20-21.)  Accordingly, even if one accepts that the language in the second part of Section 2 of the Assignment of Claim Agreement is part of the definition of the Schedule Purchase Price (*i.e.*, the sum Credit Suisse was obligated to pay immediately), Credit Suisse still breached its own agreement.  It refused to pay out based on an amendment of LNT's Schedule that occurred within the "from time to time" constraint of the Assignment of Claim Agreement.

      c.    *If the provisions upon which Credit Suisse seeks to avoid its promises are ambiguous, they present an issue of fact.  Dismissal would therefore be improper.*

Credit Suisse rests its defense upon its supposed obligation to pay only the "Schedule Purchase Price," and not the Net Account Value, within the 25 day assignment deadline.  However, the foregoing excerpts leave no doubt that definition of Schedule Purchase Price is tainted by its logical inconsistencies and ambiguity.  Moreover, even if one adopts the calculation language of the latter half of Section 2 as a part of the definition of "Schedule Purchase Price," by one perfectly tenable construction of the contract language Credit Suisse violated its own agreement by refusing to accept an assignment of receivables after LNT had amended its bankruptcy schedule to correct the initial error.  Such amendments are specifically provided for by the language of Section 2, which calculates the Schedule Purchase Price upon the Schedules, *"as may be amended from time to time."*

Credit Suisse may urge a differing interpretation of the documents but the prominent material ambiguities in the key contract language present an issue of fact that precludes the granting of its motion to dismiss on the pleadings. "'[W]hen the language of a contract is ambiguous, its construction presents a question of fact, which of course precludes summary dismissal' on a Rule 12(b)(6) motion." (*Maniolos v. U.S.,* 741 F.Supp.2d 555, 567 (S.D.N.Y. 2010); *see also, Seiden Associates, Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir. 1992) ["Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact and summary judgment is inappropriate...."])

Credit Suisse wrote the contract documents. It may not impose an interpretation of its own ambiguities that would result in a forfeiture of contract rights against the opposing party. "It is ... well settled that contract ambiguities should be construed against the drafter." (*In re Saranac Cent. School Dist. (Sweet Associates Inc.)* 253 A.D.2d 566, 567 [686 N.Y.S.2d 869, 871] (N.Y. App. Div. 1998).) Such a result would be doubly offensive if were imposed upon a pleading motion, without providing Aeolus Down with the opportunity to present its case as to the meaning of the key contract provision. For these reasons, Credit Suisse's motion must be denied.

        d.     *Credit Suisse's proffered interpretation of the controlling documents ignores the reasonable expectations of the parties.*

In construing a business contract, the Court must take into account the purpose of the agreement and the reasonable expectations of the parties in light of that purpose when construing the contract's terms. "This Court has held that 'reasonable expectation and purpose of the ordinary businessperson when making an ordinary business contract' serve as the guideposts to

determine intent." (*Uribe v. Merchants Bank of New York*, 91 N.Y.2d 336, 341 [693 N.E.2d 740, 743] (1998).) Aeolus Down's intent in making the agreement is self-evident: it sought to insure itself against he risks associated with extending credit to LNT.  Credit Suisse could not have misunderstood that intent when it made the agreement and accepted hundreds of thousands of dollars in premium payments.

Yet Credit Suisse's now offers an interpretation of its agreement that flies in the face of this expectation by imposing a nonsensical division of rights and duties.  According to Credit Suisse, under the circumstances alleged in the First Amended Complaint, (*i.e.*, millions of dollars of valid receivables are erroneously omitted from the debtor's schedules), Aeolus Down still has the duty to assign its receivables to Credit Suisse within the 25 day deadline under Section 8 of the Master Agreement.  What it gets in exchange for meeting this strict deadline and giving up control of bankruptcy claim is the immediate payment of – *nothing*.  As Credit Suisse concedes in its brief, "Credit Suisse would then have been obligated to pay the Initial Scheduled Purchase Price, which because LNT's initial Schedule of Assets and Liabilities did not list any amount owed to Aeolus Down, *would have been zero*." (Def's Memorandum of Law, pg. 16; emphasis added.)

Could that possibly have been within the "reasonable expectations of the parties" when they made the agreement?

The very idea is risible.  Aeolus Down would have been certifiably insane to pay Credit Suisse for the privilege of giving up control of its multi-million claim against the LNT bankruptcy estate, in exchange for no benefit.[7]

---

[7]   Credit Suisse advances the creative assertion that there was indeed a benefit accruing to Aeolus Down if it assigned its accounts in a timely manner.  It argues that under the Additional Purchase Price provision of the Assignment of Claim Agreement (Sec. 6), Aeolus Down would

The reasonable inference is thus unavoidable.  If Aeolus Down was destined to recover only table scraps from the LNT bankruptcy distribution months or years in the future, it did not need to pay Credit Suisse hundreds of thousands of dollars to act as a conduit for them.  It did not expect that its costly protection would evaporate because of a trivial mistake.

Accordingly, Credit Suisse's proffered interpretation of the documents would only thwart this intent based on the fortuitous occurrence of a third party's scheduling error.  The Court must reject it in favor of the most obvious inference – that is, the parties did not contemplate an interpretation of the agreement under which a nonparty's clerical error – though promptly corrected – would cause Aeolus Down to forfeit all of the protection that it had purchased.

### C.   The Allegation Of A Settlement Agreement With LNT's Chapter 7 Trustee Does Not Support A Grant Of The Defendant's Motion.

Credit Suisse cites the fact that Aeolus Down entered into a settlement agreement with LNT's Chapter 7 Trustee as a defense against its liability on its contract.  (Def's Memorandum of Law, pg. 19.)  Nothing is pleaded in that respect; such a defense is clearly an affirmative one and is not among the allegations of the First Amended Complaint.

As to the contention that Aeolus Down is required to tender to Credit Suisse unimpaired claims under Section 4(x) of the Assignment of Claim Agreement, Aeolus Down had previously

---

have been permitted to recover whatever monies were distributed on the account "if the Bankruptcy Court issues a 'Final Order' in an amount greater than the initial 'Scheduled Claim Amount' [*i.e.,* zero]." (Defs'. Memorandum of Law, pg. 16.)  However, that argument collapses under cursory scrutiny. *Aeolus Down would have been entitled to the value of its own bankruptcy claim without buying costly protection from Credit Suisse.*  It gains nothing to permit Credit Suisse to simply hand over its own funds after months or years of bankruptcy court proceedings.  It is clear that the "Additional Purchase Price" provision was designed to address the rare occurrence in which Credit Suisse has already paid out on assigned claims, and then manages to recover more than its payout from the bankruptcy court.  In that case, the insured entity gets the excess.  The provision was not designed to address a circumstance where a fortuitous scheduling error precluded any payout at all.

tendered to Credit Suisse the unimpaired claims *five times* before entering into the Settlement Agreement with LNT's Chapter 7 Trustee, each of which has been rejected.

First, it is axiomatic in the American law of contracts that once a party has breached a material term of a contract, the other party is excused from any further performance. *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F. 3d 171, 187 (2d Cir. 2007).   Accordingly, any actions taken by Aeolus Down after Credit Suisse's rejection of our tenders, is absolutely irrelevant.

The following is a detailed timeline of Aeolus Down's 5 separate attempts to tender the claims, or demand the payment of its insurance benefits pursuant to the tendered claims.

- On July 31, 2008 Travis Tom of Chang & Coté, LLP first tendered the two claims to Credit Suisse and requested that an Assignment of Claim Agreement be issued. See Exhibit "D" to the Tom Declaration.   The claims were officially tendered to Credit Suisse at this time. Using the excuse that the claims had been erroneously scheduled under LNT Merchandising LLC's schedules, Credit Suisse issued an Assignment of Claim Agreement with a "Scheduled Claim Amount" of $0.00.

- On September 19, 2008, Dennis Lee of Chang & Coté, LLP notified Credit Suisse that Aeolus Down's claims had now been properly scheduled under Linens N' Things Inc.'s schedules, therefore an updated Assignment of Claim Agreement should be issued  in conformance with the tendered claims.  Credit Suisse's outside counsel responded by stating orally that Aeolus Down had failed to satisfy one of the conditions precedent to the purchase of claims. See Exhibit "F" to the Tom Declaration.

- On October 20, 2008, Dennis Lee sent Credit Suisse's outside counsel a detailed letter outlining Aeolus Down's position, the issues surrounding this matter, and again demanding

the issuance of an updated Assignment of Claim Agreement in conformance with the tendered claims.  See Exhibit "G" to the Tom Declaration.

- On November 17, 2008, Steven J. Coté sent Credit Suisse's in-house counsel a detailed letter outlining Aeolus Down's position and explaining why the position previously taken by Credit Suisse's outside counsel was wrong, and once again made demand for payment in conformance with the tendered claims.  See Exhibit "H" to the Tom Declaration.

- On March 23, 2010, Rodney Bell of Chang & Coté, LLP sent Credit Suisse's in-house counsel a letter chronologically detailing the events contained in the Complaint and demanding the payment of $2.3 million to Aeolus Down by April 9, 2010 in conformance to the tendered claims.  See Exhibit "I" to the Tom Declaration.

As for the issue of "impairment", Aeolus Down has neither withdrawn nor impaired its claims.  Indeed, the treatment of the 2 Aeolus Down claims was central to the preference claim settlement discussion between Aeolus Down and the Chapter 7 Trustee of LNT.  Specifically, Aeolus Down agreed to "waive" its rights to receive distribution from…, rather than to withdraw the claims outright.  This request was agreed by the Trustee of LNT and accounted for in the Rule 9019 settlement motion filed in Delaware.

Attached as Exhibit "J" to the Tom Declaration is a letter Steven Coté sent to the counsel of the LNT Trustee detailing Aeolus Down's position and the need to "preserve" the Aeolus Down claims.  Attached as Exhibit "K" to the Tom Declaration is the relevant e-mail trial between the counsel of the LNT Trustee and Chang & Coté, LLP wherein on September 10, 2010, counsel of the LNT Trustee agreed to Aeolus Down's request and noted that "I trust this language satisfies your concern."

26

The bottom line is that both Proofs of Claims filed by Aeolus Down in the LNT bankruptcy case remain valid, and Aeolus Down has not "waived" away Credit Suisse's ability to recover from the Estate of LNT -- assuming that there is going to be any distribution from this cash-poor estate.

### D.  Aeolus Down Has Stated A Valid Claim For Tortious Breach Of Contract.

Credit Suisse argues that it can have no liability for tortious breach of contact because "there is no legal basis…to characterize the Master Agreement as an insurance contract." (Def's Memorandum of Law, pg. 20.)  It also asserts that it can have no tort liability because such a remedy only exists where "a legal duty, independent of the contract itself, has been violated." (Def's Memorandum of Law, pg. 20.)

On the first point, Aeolus Down responds that the allegations establish that the subject agreements were in substance an insurance contract.  They were designed to indemnify Aeolus Down against a defined risk, *i.e.,* an LNT bankruptcy, by requiring Credit Suisse to purchase an assignment of Aeolus Down's LNT receivables should the risk be realized.  "What is in substance a contract of insurance cannot be changed into something else by giving it another name."  (*People v. Roschli,* 275 N.Y. 26, 29 [9 N.E.2d 763, 764] (1937).)

On the second point, Aeolus Down has pleaded facts sufficient to establish the breach of an independent legal duty by Credit Suisse:

> "36.   AEOLUS DOWN also contends the contracts at issue, i.e., the Master Agreement and the Assignment of Claims Agreement, are intentionally contradictory, and it is believed that these contracts are widespread and unchecked among all of CREDIT SUISSE's "customers" utilizing this financial product. It is believed that these contradictions are designed to permit CREDIT SUISSE to choose between the contradictory terms of its contracts to reduce or completely deny the amounts it has agreed to pay under the Master Agreement through deceit and subterfuge.

37.   CREDIT SUISSE further augments its deceit and subterfuge by instructing and guiding its insured to make certain that it will fall into this trap by proactively promoting, directing and steering its insured to sign subsequent documents and agreements drafted by CREDIT SUISSE to confirm and complete the deception and subterfuge

Thus, Aeolus Down has alleged that Credit Suisse has deliberately designed its contract documents to include an escape hatch to allow it to evade its obligations to its insureds. That escape hatch comes in the form of a contradiction between the language of the Master Agreement and the Assignment of Claim Agreement upon which Credit Suisse can pressure unknowing insureds to sign away their rights under their agreements.

These allegations set forth an independent pattern of behavior directed against the public at large, and not merely against Aeolus Down. Such misconduct supports a tort claim against Credit Suisse:

> "Punitive damages are not recoverable for an ordinary breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights [citation]. However, where the breach of contract also involves a fraud evincing a 'high degree of moral turpitude' and demonstrating 'such wanton dishonesty as to imply a criminal indifference to civil obligations', punitive damages are recoverable if the conduct was 'aimed at the public generally' [citation]. Punitive damages are available where the conduct constituting, accompanying, or associated with the breach of contract is first actionable as an independent tort for which compensatory damages are ordinarily available, and is sufficiently egregious under the *Walker* [v. *Sheldon*, 10 N.Y.2d 401 [179 N.E.2d 497] (1961)] standard to warrant the additional imposition of exemplary damages. Thus, *a private party seeking to recover punitive damages must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally.*" (*Rocanova v. Equitable Life Assur. Soc. of U.S.,* 83 N.Y.2d 603, 613 [634 N.E.2d 940, 943-44] (1994); emphasis added.)

Accordingly, Credit Suisse's arguments against Aeolus Down's claim for Tortious Breach of Contract lack merit. The claim, as alleged, adequately pleads a viable cause of action. Its motion to dismiss Count II of the First Amended Complaint should be denied.

## VI.  CONCLUSION.

Based upon the foregoing points and authorities, Aeolus Down respectfully urges the Court to DENY Credit Suisse's motion to dismiss.

Respectfully submitted,

/s/
_____

Steven J. Coté   (CA SBN 108251)
Dennis K. Lee (CA SBN 245162)
CHANG & COTÉ, LLP
19138 Walnut Drive, Suite 100
Rowland Heights, CA 91748
Telephone (626) 854-2112
Facsimile   (626) 854-2120

HARWOOD LLOYD, LLC
Evelyn R. Storch, Esq.
130 Main Street
Hackensack, NJ 07601
Telephone (201) 487-1080
Facsimile (201) 487-4758

*Attorneys for Plaintiffs*

Dated: September 9, 2011