UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X
AEOLUS DOWN, INC.,

                Plaintiff,           10 Civ. 8293 (LLS)

     - against -           **OPINION AND ORDER**


CREDIT SUISSE INTERNATIONAL,

                Defendant.
- - - - - - - - - - - - - - - - - -X


     Plaintiff Aeolus Down, Inc. ("Aeolus") brings this action
for breach of contract, tortious breach of insurance contract,
and declaratory relief, alleging that defendant Credit Suisse
International ("Credit Suisse") owes $2.3 million under a trade
risk mitigation arrangement designed to protect Aeolus from a
Linens 'N Things, Inc. ("LNT") bankruptcy.

     Credit Suisse moves under Fed. R. Civ. P. 12(b)(6) to
dismiss the amended complaint for failure to state a claim upon
which relief may be granted.  For the reasons that follow, the
motion is denied in part and granted in part.


## BACKGROUND


     Aeolus, a bedding manufacturer and former vendor to LNT,
contracted with Credit Suisse to hedge its exposure to LNT's
credit risk.  LNT owed Aeolus millions of dollars in accounts
receivable, i.e. payments for goods sold to LNT on credit.  The

arrangement gives Aeolus a right to sell (a "Put") some of Aeolus's claims against LNT to Credit Suisse in the event LNT went bankrupt.

Three agreements fix the rights and obligations of the parties under the plan. A master agreement ("Master Agreement") establishes the form for individual put transactions, which are effected separately through a letter agreement (a "confirmation"). Master Agreement[1] § 2. Each confirmation covers certain accounts receivable, specifies the coverage amount, period and premium, and identifies a triggering event. Should the triggering event occur, Aeolus exercises its Put by transferring the covered claims to Credit Suisse under an assignment agreement. Id. § 8(c). The parties prepare the assignment agreement if and when Aeolus exercises the Put; however, it must be executed substantially in the form of a sample attached to the Master Agreement (the "Form of Assignment Agreement"). Id. § 8(a).

Between October 8, 2007 and February 7, 2008, the parties entered into the Master Agreement and two confirmations giving Aeolus the right to sell up to $2.3 million of its claims in the event of a May 2008 bankruptcy. On May 2, 2008, LNT and its affiliates filed for bankruptcy. On July 15, 2008, LNT filed a schedule of assets and liabilities, which was supposed to list

---

[1] Annexed as Exhibit 1 to the amended complaint.

its creditors and the amounts of their claims.  However, none of Aeolus's claims appeared on LNT's schedule; they were erroneously listed on the schedule of an LNT affiliate, LNT Merchandising, LLC.

Aeolus nonetheless sought to exercise its Put.  Credit Suisse received Aeolus' request to transfer its claims, but argued it owed nothing in return because "The protection was sold with respect to claims against Linens 'N Things, Inc., not LNT Merchandising LLC."  Am. Compl. Ex. 11.  Credit Suisse prepared an assignment agreement expressing that position (the "Proposed Assignment Agreement"), and sent it to Aeolus's counsel for signature.  Aeolus declined to sign it, despite a provision in the Master Agreement that if an assignment agreement was not executed within 25 days after LNT filed its first schedule (i.e., by August 9, 2008), the Put would be "canceled, discharged and terminated and will not be reinstated or rewritten, and Purchaser [Credit Suisse] shall have no further obligation to Seller [Aeolus] in respect of that Put."  Master Agreement §§ 5(a), 8.

On September 12, 2008, LNT corrected its schedule of claims, prompting Aeolus to reattempt to exercise its Put.  Credit Suisse refused on the grounds that the 25-day period for timely execution of the assignment agreement had passed.  Id. § 5(b).

- 3 -

In September of 2010, Aeolus entered into a settlement agreement with LNT's bankruptcy trustee. The agreement provided that Aeolus pay the trustee $75,000 and waive "any and all scheduled or filed pre-petition or post-petition claims against the estate" in exchange for the dismissal of an action the trustee had commenced against Aeolus for recovery of preferential transfers, breach of contract and unjust enrichment, among other claims. Mot. to Approve Settlement of Adversary Proceeding Against Aeolus Down ¶ 13, No. 08-10832 (Bankr. D. Del. Sept. 23, 2010).

## DISCUSSION

"When reviewing a motion to dismiss, a court must accept as true all of the factual allegations set out in plaintiff's complaint, draw all inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). To state a claim for breach of contract, Aeolus must allege "(1) the existence of an agreement, (2) adequate performance of the

- 4 -

contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996) (applying New York law).

1.

Credit Suisse argues that Aeolus cannot plead adequate performance because it failed to execute an assignment agreement. Because the parties "employed the unmistakable language of condition" in the Master Agreement, Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 691, 660 N.E.2d 415, 418 (1995), execution of an assignment agreement within 25 days of LNT's initial filing of its schedule of assets and liabilities is an express condition precedent to Credit Suisse's obligation to purchase the LNT claims.[2]  An express

---

[2] In relevant part, Section 8 of the Master Agreement reads:

> 8. Conditions Precedent to Purchase of Account Claims.  The obligation of Purchaser [Credit Suisse] to purchase the Account Claims under a Put is subject to the satisfaction of the following conditions precedent:
>
> (a)  Seller [Aeolus] shall have executed the Assignment of Claim Agreement, substantially in the form of Exhibit B hereto, selling, transferring and assigning the Account Claims to Purchaser (the "Assignment Agreement") in an amount equal to the Net Account Value of the Account Claims;

Section 5(b) provides that:

> In the event Seller [Aeolus] does not satisfy the conditions set forth in Section 8 prior to the expiration of the twenty-five (25) day period set forth in Section 5(a), the Put shall be automatically canceled, discharged and terminated and will not be reinstated or rewritten, and Purchaser [Credit Suisse] shall have no further obligation to Seller [Aeolus] in respect of that Put.

Under Section 5(a), the 25 day period begins at "the initial filing of

- 5 -

condition "must be literally performed," id. at 690, 660 N.E.2d at 418, unless it is "excused by waiver, breach or forfeiture." Id.

One cannot say at this point that none of the excuses apply.  The complaint supports a plausible inference that Credit Suisse waived the 25-day deadline to execute an assignment agreement.[3]  Credit Suisse sent the Proposed Assignment Agreement to Aeolus just four days before the August 9, 2008 deadline and continued discussions after it passed.  Indeed, a response from Travis Tom, counsel for Aeolus, to a message dated August 11, 2008 from Adam Feinmesser, counsel for Credit Suisse, suggests that Credit Suisse was still trying to secure Aeolus's signature after the 25-day period had already expired.[4]  Nonetheless Credit

---

the Company's [LNT's] Schedule of Assets and Liabilities."

[3] The no-waiver clause in the Master Agreement does not preclude such a finding because that clause does not unambiguously apply to a waiver of the 25-day period: a violation of the 25-day period does not trigger a right that Credit Suisse may exercise at its discretion, but rather automatically cancels the Put.  See Master Agreement § 15(b) ("No failure on the part of any party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof by such party, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.").  Moreover, under New York law, "it has long been the rule that parties may waive a 'no-waiver' clause."  See Lee v. Wright, 485 N.Y.S.2d 543, 544, 108 A.D.2d 678, 680 (App. Div. 1985).

[4] The full text of Mr. Tom's email reads:

"Mr. Feinmesser,
I am in trial at the current time.  As a result, I passed along to our transactional department for a second opinion.

Without having the contract in front of me, my concern is that Credit Suisse is arguing that the payment of the limit of the transferred claim does not need to occur until finalization of the Case because Linens N' Things scheduled the amount due to

Suisse did not advise Aeolus that the Put was canceled until October 14, 2008, and only after Aeolus requested an updated assignment agreement based on LNT's amended schedule. Am. Compl. ¶¶ 20-21. Such affirmative conduct and failure to act after the deadline had passed might be found to be a waiver. See Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist., 85 N.Y.2d 232, 236, 647 N.E.2d 1329, 1331 (1995) ("Waiver may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage.").

Anticipatory breach may apply if Credit Suisse "insisted on an untenable interpretation of a key contractual provision," IBM Credit Fin. Corp. v. Mazda Motor Mfg. (USA) Corp., 92 N.Y.2d 989, 989, 706 N.E.2d 1186, 1186 (1998) (anticipatory breach found where party conditioned closing on the acceptance of commercially unreasonable terms that belied the language of the agreements). A jury might find that the assignment agreement Credit Suisse proposed transgressed the terms to which the parties had already agreed, see Section 2 quoted at fn. 5 on p.

---

Aeolus Down under Linens N' Thing Merchandising as opposed to Linens N' Things proper. If this is the case, I fail to see the point of transferring the claim or the relationship to the original purpose of the Put Agreement.

However, this was based on a preliminary and very cursory review. Please confirm your client's position with respect to this matter and whether I am in error. If I am not in error, please reference the language of the original agreement which would form the basis for Credit Suisse's position on that matter."

Am. Compl. Ex. 11.

10, infra, and asserted a position no reasonable businessperson could accept: under its terms, Aeolus would transfer claims of $2.3 million potential value for nothing in return.    An anticipatory breach would excuse Aeolus from further performance.    See Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc., 522 N.Y.S.2d 292, 293, 135 A.D.2d 891, 892 (App. Div. 1987) ("Further, where it becomes clear that one party will not live up to a contract, the aggrieved party is relieved from the performance of futile acts or conditions precedent.").

Strict application of the 25-day period as a condition precedent may also be excusable to avoid forfeiture. Oppenheimer, 86 N.Y.2d at 691, 660 N.E.2d at 419 ("'To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange.'"), quoting Restatement (Second) of Contracts § 229 (1981).

Aeolus faces forfeiture: it paid $651,500 on the expectation that it would receive an indemnity of over two million dollars if LNT went bankrupt.    Id. at 692 n.2, 660 N.E.2d at 419 n.2 ("Forfeiture is the 'denial of compensation that results when the obligee loses [its] rights to the agreed exchange after [it] has relied substantially, as by preparation

- 8 -

or performance on the expectation of that exchange.'") (brackets in Oppenheimer), quoting Restatement (Second) of Contracts § 229, cmt. b (1981).

The facts support a plausible inference that the 25-day period was not a material part of the agreed exchange. No clause states that time is of the essence in execution of the assignment agreement, and that meaning cannot be inferred from the mere presence of the condition in the contract. See Urban Archaeology Ltd. v. Dencorp Inv., Inc., 783 N.Y.S.2d 330, 335, 12 A.D.3d 96, 103 (App. Div. 2004) ("While the parties can assure a finding that 'time is of the essence' by including those, or equivalent words, within their agreement, specification of a particular time frame within the language of the contract by itself is not determinative of whether a delay would constitute a material breach of the agreement.") (citations omitted). Nor is there evidence that a delay would prejudice Credit Suisse.

Credit Suisse argues that the 25-day period was material as a matter of law because the agreements at issue are option contracts: "A Court 'may not decide that the non-occurrence . . . is excused to the extent of one day because that would give [the other side] a move (sic) extensive option than that on which the parties agreed.'" Def. Rep. Mem. 7, quoting Restatement (Second) of Contracts § 229 cmt. c illus. 5 (1981)

- 9 -

(brackets in memorandum).  The general rule that "time is of the essence of an option," Urban Archaeology, 783 N.Y.S.2d at 335, 12 A.D.3d at 103-4, does not apply here.  Under the facts alleged, the purpose of the agreements was not to offer Aeolus the choice of coverage if LNT went bankrupt, but to cover it, unquestionably, once that event transpired.  Thus, unlike a typical option contract, both the benefit to Aeolus and Credit Suisse's exposure were determined before the 25-day period began to accrue.  Whether it was material to the bargain therefore poses a question of fact.

2.

Credit Suisse contends that it was only required to pay Aeolus the amount in claims listed on LNT's initially filed schedule (i.e., LNT's schedule as it existed before the September 12, 2008 amendment correcting the listing error) pursuant to Section 2 of the Form of Assignment Agreement ("Section 2").[5]  Because that schedule mistakenly omitted Aeolus

---

[5] Section 2 of the Form of Assignment Agreement provides that the consideration paid in exchange for the claims transferred to Credit Suisse is the "Scheduled Claim Amount," or "the amount of the Claim listed on the Schedules, as defined below, as undisputed, noncontingent and liquidated as of the Effective Date."  Form of Assignment Agreement  § 2.  "Schedules," in turn, are defined in Section 4 of the Form Assignment Agreement as "the Debtor's schedules of creditors holding unsecured claims filed or to be filed with the Bankruptcy Court, as the same may be amended from time to time (the "Schedules")," and "Effective Date" is defined in Section 2 as "The date on which Purchaser [Credit Suisse] pays the Schedule Purchase Price, if applicable, to Seller [Aeolus]."  Id. §§ 2, 4.  After incorporating all referenced terms, the purchase price is

The amount of the Claim listed on the Debtor's schedules of creditors holding unsecured claims filed or to be filed with the

- 10 -

and its claims, Credit Suisse argues that it did not have to pay Aeolus anything, and hence never breached.

Credit Suisse cannot rely on that provision to effect a forfeiture any more than it can rely on an immaterial condition precedent: provisions in contracts must be given a "practical interpretation to the language employed and the parties' reasonable expectations."   AFBT-II, LLC v. Country Vill. on Mooney Pond, Inc., 759 N.Y.S.2d 149, 150-51, 305 A.D.2d 340, 342 (App. Div. 2003).

Section 2 functions as a source of definition of a price term in the Form of Assignment Agreement, but makes no allowance for errors in the list except to allow that it may be amended from time to time until Credit Suisse pays the Scheduled Purchase Price.   Such a provision does not require a ruling, as a matter of law, that the first valuation placed on the list be accepted as decisive, even when the entry is known to be wrong.

Rather, it raises issues of intent and understanding which, like questions about the materiality of terms, waiver, and the purpose and scope of the agreements, require factual development.

---

Bankruptcy Court, as the same may be amended from time to time, as undisputed, noncontingent and liquidated as of the date on which Purchaser [Credit Suisse] pays the Schedule Purchase Price, if applicable, to Seller [Aeolus].

## The Settlement with LNT's Chapter 7 Trustee Does Not
## Require Dismissal of the Complaint

Credit Suisse argues that Aeolus annulled the agreements by waiving its claims against LNT as part of its settlement agreement with LNT's Chapter 7 trustee.  Aeolus entered the settlement agreement in September 2010, or roughly two years after Credit Suisse allegedly breached.  The ramifications of that transaction are insufficiently developed to allow any ruling about its effect.

## The Claim for Tortious Breach of Insurance Contract Is Dismissed

New York law does not recognize a cause of action for tortious breach of an insurance contract.  New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 319-20, 662 N.E.2d 763, 770 (1995) (an action for bad faith denial of insurance coverage "amounts to nothing more than a claim based on the alleged breach of the implied covenant of good faith and fair dealing, and the use of familiar tort language in the pleading does not change the cause of action to a tort claim in the absence of an underlying tort duty sufficient to support a claim for punitive damages").

Nor has Aeolus adequately alleged that Credit Suisse violated any duty independent of its obligations under the contracts.  Aeolus claims that the Master Agreement and Form of

- 12 -

Assignment Agreement are "intentionally contradictory," and that the contradictions are "designed to permit CREDIT SUISSE to choose between the contradictory terms of its contracts to reduce or completely deny the amounts it has agreed to pay under the Master Agreement through deceit and subterfuge." Am. Compl. ¶ 36.  However, the agreements offer consistent expressions of the bargain struck by the parties: the Master Agreement provides a method for determining the amount in claims Aeolus would transfer to Credit Suisse, see Master Agreement § 8(a), quoted at fn. 2 on p. 5, supra, while the Form of Assignment Agreement provides one for the consideration Credit Suisse would pay in exchange, see Form of Assignment Agreement § 2, quoted at fn. 5 on p. 10, supra.  Aeolus's tort claim is therefore dismissed.

### The Claim for Declaratory Relief is Dismissed

Aeolus requests "that this Court make a judicial determination that the notice of claim requirements in the Insurance Policy have been fully and/or substantially complied with by AEOLUS DOWN thereby entitling AEOLUS DOWN to the relief herein." Am. Compl. ¶ 44. In short, it seeks a "declaration of the same rights as will be determined" under its action for breach of contract. Apple Records Inc. v. Capitol Records, Inc., 137 A.D.2d 50, 54, 529 N.Y.S.2d 279, 281 (App. Div. 1988). Its claim for declaratory relief is therefore dismissed as

- 13 -

duplicative.   Id.   ("A cause of action for declaratory judgment is unnecessary and inappropriate when the plaintiff has an alternative remedy in another form of action, such as breach of contract."); see Alizio v. Feldman, 82 A.D.3d 804, 805, 918 N.Y.S.2d 218, 219 (App. Div. 2011) ("Declaratory relief is inappropriate since the plaintiffs have an adequate alternative remedy in the form of a cause of action alleging legal malpractice.") (citations omitted).

## CONCLUSION

Defendant Credit Suisse's motion (Dkt. No. 26) to dismiss the amended complaint is granted in part and denied in part. The claims for tortious breach of insurance contract and declaratory relief are dismissed.   Credit Suisse's motion is denied with respect to the claim for breach of contract.


So ordered.


Dated: New York, New York
       November 15, 2011


_Louis L. Stanton_
LOUIS L. STANTON
U.S.D.J.